Jen-Feng Lee, SBN 204328, *Pro Hac Vice*
jflee@ltpacificlaw.com
Kenneth K. Tanji, Jr., SBN 162273
ktanji@ltpacificlaw.com
**LT Pacific Law Group, LLP**
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Attorneys for Defendants
RLG DOCKING SYSTEMS Inc.,
and ROBERT L. GAUGENMAIER

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| SAFEGATE AIRPORT SYSTEMS, Inc. a Minnesota Corporation; and SAFEGATE INTERNATIONAL, a Corporation of Sweden,<br><br>    Plaintiffs/Counterdefendants,<br><br>vs.<br><br>RLG DOCKING SYSTEMS Inc., an Arizona Corporation; and Robert L. GAUGENMAIER, individually, Defendants/Counterclaimants.<br><br>    Defendants/Counterclaimants. | CASE NO. 2:13-cv-00567-PHX-GMS<br><br>**DEFENDANTS RLG's Claim Construction Opening Brief**<br><br>**Date: April 25, 2014**<br>**Time: 9:00 am**<br><br>**Courtroom: 602** |

# Table of Content

Key Issue

| | | | |
|---|---|---|---|
| I. | The laws of claim construction | …………….. | 2 |
| II. | The brief over view of Safegates' Patents-in-Suit | …………….. | 4 |
| | 665 Patent | …………….. | 5 |
| | 489 Patent | …………….. | 7 |
| | Other earlier patents on aircraft docking or laser/pulse scanning | …………..… | 9 |
| III. | RLG's proposed construction | …………….. | 10 |
| IV. | Conclusion | …………….. | 17 |

# Table of Cases

| | | |
|---|---|---|
| Alloc, Inc. v. Int'ls Trade Comm'n, 342 F.3d 1361 (Fed. Cir. 2003) | …………….. | 2 |
| Antonious v. Spalding & Evenflo, 275 F.3d 1066, 1071 (Fed. Cir. 2002) | …………….. | 4 |
| Ariad Pharms v. Eli Lily, 598 F. 3d 1336 (Fed. Cir, 2010) | …………….. | 2 |
| Chamberlain Group v. Lear Corp., 516 F.3d 1331 (Fed. Cir. 2008) | …………….. | 2 |
| Cormark Commc'n v. Harris Corp., 156 F.3d 1182 (Fed. Cir. | …………….. | 3 |
| iLor, LLC v. Google, 631 F.3d 1372, 1378 (Fed. Cir. 2011) | …………….. | 4 |
| Modine Mfg. Co. v. United Status Int'l Trade Comm'n, 75 F.3d 1545, 1557 (Fed. Cir. 1996 | …………….. | 3, 11 |
| Phillips v. AWH, 415 F.3d 1303 (Fed. Cir. 2005; en banc) | …………….. | 2, 3, 10, 17 |
| Salazar v. Proctor & Gamble, 414 F.3d 1342 (Fed. Cir. 2005) | …………….. | 3 |
| SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1285 (Fed.Cir.2005) | …………….. | 3, 11 |
| Suffran v. John & Johnson, 712 F.3d 549, 562 (Fed. Cir. 2013) | …………….. | 4, 15 |

Come now Defendants RLG Docking Systems, Inc, and Robert L. Gaugenmaier ("RLG", collectively) and for their Claim Construction Opening Brief, state as follows:

**A key issue in this claim construction exercise is:**

How do we ensure that Plaintiffs' patent rights are protected, based upon the proper "scope of the right to exclude, as set forth in the claims, so as not to overreach the scope of the inventor's contribution to the field of art as described in the patent specification". *Ariad Pharms v. Eli Lily*, 598 F.3d 1336, 1353 (Fed. Cir. 2010).

Asked another way: Are Plaintiffs seeking to construe the scope of the claim that is commensurate with the enrichment to the public knowledge by the patent specification, which is the *quid pro quo* of the patent bargain?

## I.     The Laws of Claim Construction.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.* 415 F.3d 1303, 1312 (Fed. Cir. 2005; en banc)

Claim construction is from the perspective of one of ordinary skill in the pertinent art at the time the patent was filed. *Chamberlain Group v. Lear Corp*. 516 F. 3d 1331, 1335 (Fed. Cir. 2008).

Whatever the specific articulation, the test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed. *Ariad v. Eli Lily*, at 1351.

Courts give claim terms their "ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent". *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

**Defendants' Claim Construction Opening Brief**

An Examiner's understanding of a term is evidence of the understanding to one having skill in the art. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005)

In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, at 1314. Other asserted or asserted claims can also aid in determining the claims meaning because claim terms are typically used consistently throughout the patent. *Id.*

A patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. In these situations, the inventor's lexicography governs. *Philips*, at 1316.

Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims. *Comark Commc'n v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 2004).

A claim construction that excludes a preferred embodiment ... 'is rarely, if ever, correct.' *SanDisk Corp. v. Memorex Prods., Inc*., 415 F.3d 1278, 1285 (Fed.Cir.2005)

The Court must construe the claims to preserve their validity. *Modine Mfg. Co. v. United Status Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996).

A court is authorized to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries and learned treatises". *Markman*, 52 F.2d at 980.

A element in a claim expressed as a means or step .. without recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof. *36 U.S.C. §112, ¶6*.

The "structure disclosed in the specification is 'corresponding structure' only if the specification or prosecution history clearly links or associates that structure to the

function recited in the claim. This duty to link or associate structure to function is the quid pro quo for the convenience of employing 36 U.S.C. §112, ¶6. *Suffran v. John & Johnson,* 712 F.3d 549, 562 (Fed. Cir. 2013)

Claim construction is a matter of law, so that an attorney's proposed claim construction is subject to Rule 11(b)(2)'s requirement that all legal arguments be nonfrivolous. *Antonious v. Spalding & Evenflo*, 275 F.3d 1066, 1071 (Fed. Cir. 2002).

Reasonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous. But, there is a threshold below which a claim construction is "so unreasonable that no reasonable litigant could believe it would succeed", *iLor, LLC v. Google*, 631 F.3d 1372, 1378 (Fed. Cir. 2011).

**II. The brief overview of Safegates' Patents-in-Suit**

Plaintiffs (collectively "Safegate") assert two patents: 6,023,665 ("665 Patent) and 6,324,489 ("489 Patent"), collectively, Patents-in-Suit, that are in the technology field of detecting, identifying, verifying and tracking a moving object (aircraft), for the purpose of guiding such aircraft to its docking destination (the gate in an airport terminal).

Both Patents-in-Suit are titled "AIRCRAFT IDENTIFICATION AND DOCKING GUIDANCE SYSTEMS".

665 Patent was the parent application, upon which 485 Patent was based and contained additional teaching/disclosure (the Inner Volume / Outer Volume feature, Vi/Vo, to be discussed later) that later became a separate patent.

665 Patent has its priority filing date of 10/14/1994, based upon a PCT filing. 489 Patent has the same priority date, except for its Vi/Vo feature, whose priority date was 10/29/1999.

The Patents-in-Suit are attached herein as Exhibit A.

**Defendants' Claim Construction Opening Brief**

Their inventive substance is briefly stated herein below.

**665 Patent**

The 665 Patent disclosed and claimed a system (element 10 denoted in 665 Patent) that employs a Laser Range Finder (LRF 20) (a known art product that is not part of the invention of 665 patent, other than the way it is used for the patented system/method), to send out light pulses to an aircraft taxing on the runway of an airport.

The system, based upon its architecture taught in the patent, performs the operation of detecting, identifying, tracking and then guiding the aircraft to the proper docking point at an assigned gate based upon airport control tower's instruction.

The patented system has three mirrors: a calibration mirror 68 for initial system calibration and two mirrors for 2-dimensional (2-D) scanning of the airfield. (The mirror 68, for calibration use, is not in the scope of claim construction dispute and will no longer be mentioned in this briefing.)

In accordance with the disclosure of 665 Patent, the LRF does not move. The 2-D scanning is accomplished by the two step motors that move around the two mirrors (21/22).  (Although 665 Patent talked about a fixed LRF being the "preferred" embodiment, there was NO other embodiment disclosed.)

Figure 2 of 665 Patent shows the general system architecture of the docking guidance system; Figure 4 shows generally the 665 patent system's operation re capturing (detecting and identifying the aircraft), tracking and guiding for docking.

In order to identify the shape of the aircraft 12 (so that the aircraft can be guided to the proper stopping point in front of an assigned docking gate), the light pulses from the LRF are directed to scan the airfield in a two-dimensional fashion, under the means of two mirrors 21/22 and two step motors 24/25, which are in turn controlled by a microprocessors 26.

**Defendants' Claim Construction Opening Brief**

A very brief but succinct disclosure of this projecting means is given at 5:48 – 53 of 665 Patent:

"The scanning by the laser is done with mirrors. One mirror 22 controls the horizontal angle of the laser while the other mirror 21 controls the vertical angle. By activating the step motors 24, 25, the microprocessor 26 controls the angle of the mirrors and thus the direction of the laser pulse."

The scanning of the aircraft is done at an angular step of 0.1 degree; the acquired data points are then compared to stored profiles, defined as Table I in the 665 Patent.

Throughout 665 Patent (and 489 Patent as well), all the calculation and data structure to compare the scanned data points (for purpose of comparing to stored aircraft profile) is based upon the teaching of angular step of 0.1 degree and nothing else.

The system maintains horizontal and vertical Table I for the aircrafts that it will be asked to guide towards the proper docking position in front of a gate. These profile tables built in its data points based upon the same angular step of 0.1 degree (otherwise, if the stored profile's date points are in different angular step, say 0.5 degree, the comparison would be meaningless.)

Based upon the 2-D scanned data points, the system then creates a Comparison Table II, for continuing tracking of the aircraft.

During each scan (at 0.1 degree angular interval, both vertically and horizontally), the microprocessor 26 also generates a Distance Distribution Table (DDT), which is used to calculate the average distance to the stopping point 53.

The system also uses Comparison Table II to calculate a tracked aircraft's lateral offset (when the aircraft is not precisely aligned to the projected line leading to the docking gate).

The system architecture and operation serve to guide an aircraft to dock properly at a predetermined stopping point in front of an assigned age for the

**Defendants' Claim Construction Opening Brief**

aircraft type. If somehow the aircraft type is incorrect (for example, a Boeing 747 being directed to dock at a smaller gate), the system can recognize and identify that the aircraft is not the intended type and will issue instruction, via a visual display unit (18) to the pilot, so as to stop the aircraft, before further damage done to the gate or the aircraft.

The Figure 2 of the 665 Patent is inserted herein, for a quick summary view of the patented architecture for the system's "projecting means":

LRF 20 sends out light pulses; LRF is fixed to the system 10;

Mirror 21 controls the vertical angle of the light pulses reflected

Mirror 22 controls the horizontal angle of the light pulses reflected

Step motor 24 actuates and controls the angular steps of Mirror 21

Step motor 25 actuates and controls the angular steps of Mirror 22



Figure 2 of the 665 Patent

**489 Patent**

489 Patent builds on the invention of 665 Patent (utilizing the same architecture, data structure of tables and steps of detection, identification, tracking and guiding for docking), and added only one inventive substance:

**Defendants' Claim Construction Opening Brief**

"To distinguish among aircrafts with similar profiles, the LRF is directed at a volume in which a feature such as engine is expected and at another volume in which the engine is not expected. The echoes from the two volumes are used to determine whether the engine is in its expected location." See SG000508, in Exhibit B and Abstract of 489 Patent.

Figures 12 – 14 of 489 Patent shows this added inventive substance of detecting an engine in the defined spatial volumes of Vi and Vo (inner volume and outer volume), with descriptions given generally in columns 14 – 15.

Particularly, at 14: 38 – 59, the inner volume Vi is defined at the spatial volume where an engine is expected to exist "such the echoes from within Vi are considered to come from the engine", at 14:42.

The outer volume Vo is the defined space around the "engine where there must be no or very few echoes", at 14:48.

When the threshold value of echoes detected from the aircraft, using the formula of Vi/(Vi+Vo), exceeds an empirical figure (the number of 0.7 is given in the 489 Patent), the existence of the engine (as detected) is confirmed, for further distinguishing aircrafts of similar profiles.



**Defendants' Claim Construction Opening Brief**

> 13: engine ;          12: aircraft
>
> Vi: the volume where echoes from the engine will be detected
>
> Vo: the volume where no or very few echoes will be detected

**Other earlier patents on aircraft docking or laser/pulse scanning**

a. Ichinose 4,995,102 patent, filed on 5/10/1988 and issued on 2/19/1991, taught to project laser scanning in 2-D spiral scanning fashion. Ichinose 102 is attached as Exhibit C.

b. Mann, 4,994,681 patent, filed on 10/6/1989 and issued on 2/19/1991, entitled "Device for detecting the position of a moving body, in particular an aircraft, in a plane". The Mann patent has a means for engaging in 2-D scanning of an aircraft that it directs "a laser beam in a sector of planar and thin cross section, in a geometrical plane substantially parallel to the plane of movement of the moving body, and with an angle of divergence adapted to possibilities of displacement of the moving body in said plane of movement for intercepting a given point of the moving body located in the geometrical plane of the beam" (in Claim 1). Mann 681 is attached as Exhibit D.

c. Germany patent application (published) DE 43 01 637 A1, filed on 1/22/1993, described an aircraft tracking, guiding and docking system where laser beam pulses are projected to scan the aircraft in horizontal and vertical directions. This application (original Deutsch version and English translation version) is attached as Exhibit E.

d. Graham 4,736,247 patent, a video scanning and range finding system, filed 1987 and issued in 1988, included a single-mirror scanning mechanism (a reflector 14). Graham 247 is attached as Exhibit F.

e. Tabel 5,889,479 patent, issued in March 30, 1999, contained yet another aircraft approaching/parking guidance system where 2-D laser scanning and sensing mechanism is employed. Tabel 479 is attached as Exhibit G.

### III. RLG' proposed construction.

1. Claim 14 of 665 Patent: "means for projecting":

    a. <u>Defendants RLG's proposed construction:</u> Means of using two (2) mirrors (21/22, one for horizontal and one for vertical scan), each mirror separately controlled by a step motor.

    b. As the 665 Patent specification clearly disclosed, the 2-D scanning is accomplished by the two step motors (24/25) that move around the two mirrors (21/22).

    c. No other "corresponding structure, material, or acts" were described in the 665 Patent that would support the correction construction of the "means" element herein, per *36 U.S.C. §112, ¶6*.

    d. In the deposition testimony on 10/24/2014, Safegate's Rule 30(b)(6) representative ("30b6 Rep"), affirmatively stated that the patented system has a fixed LRF (not moving) and that if only ONE mirror is used, the system will not be able to perform the needed 2-D scanning. See deposition pages 31 – 32, in Exhibit H.

    e. As such, interpreting this claim term as proposed comports with "what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. *Phillips*, at 1316.

    f. At 5:48 – 53 of 665 Patent, the system is taught to implement such "projecting means" that "The scanning by the laser is done with **mirrors**. One **mirror 22 controls the horizontal angle** of the laser

while the other **mirror 21 controls the vertical angle**. By **activating the step motors 24, 25, the microprocessor 26 controls the angle of the mirrors and thus the direction of the laser pulse**." **(Emphasis added).**

g. The inventor's own lexicography specifically stated that, at 5: 51 – 53, the system "activating the **step motors 24, 25**, the microprocessor 26 controls the angle of the **mirrors** and thus the direction of the laser pulse." (**Emphasis added**).

h. The use of two mirrors is critical to everything else that follows in the system's operation, as stated at bottom of column 5: "During the tracking mode, the vertical mirror 21 is continuously adjusted to keep the horizontal scan tracking the nose tip of the aircraft12". 5: 65 -67.

i. Without the use of two mirrors at the same time, the "continuously adjusted" stated herein above simply would not work.

j. The 30b6 Rep also testified, at pages 23 – 26 (see Exhibit H), that two mirrors must be used for the system to work.

k. To adopt other proposed construction (such as the "MIRROR", its singular form) proposed by Plaintiff, would be to exclude the preferred embodiment, which is rarely, if ever, correct. " *SanDisk Corp. v. Memorex Prods., Supra*.

l. Moreover, to adopt other proposed construction would be tantamount to vitiate the validity of the 665 Patent. *Modine, Supra*.

2. Claim 14 of 665 Patent: "means for detecting"

a. <u>Defendant RLG's proposed construction</u>: Blocks of Figure 8, based upon angular step of 0.1 degree interval for horizontal (α) and vertical (β) scanning, using Profile Table I to create a Comparison Table for the detecting task.

**Defendants' Claim Construction Opening Brief**

    b. 665 Patent disclosed the detection of the object's (aircraft) position, based upon its 2-D scanning, where the angular step of 0.1 degree is used as the scanning interval, and by referencing the stored aircraft profile (Table I, which also used the same 0.1 angular step as the basis for its stored value applicable to the needed comparison from the data points acquired by the "projecting means"; the data structure of the Profile Table, with stored values based upon the angular steps, is defined in the 665 Patent) to create a Comparison Table.

    c. Based upon the echoes detected by the received light pulses ("projecting means" emitting to aircraft and echoing back), the data points in the Comparison Table are then used to calculate the lateral offset to an imaginary line and the distance to the predetermined stopping point for the aircraft.

    d. The text description in columns 9 – 10, and other supporting figures reflect this term meaning, instead of other general and vague term meaning.

    e. Specifically on top of column 9 where the teaching of 665 Patent talked about information of axial location and distance from the stopping point, the system scans horizontally by directing the LRF to send out laser pulses in single angular steps at 0.1 degree intervals.

    f. To the extent Figure 7 (which is the "capture mode" chart, as stated in the 665 Patent) sheds some light on the "means for detecting", the first execution block supports RLG's proposed reading that the scanning to obtain/create Comparison Table is done with 10 scans in a 1-degree sector (which is 0.1 degree scan interval, for purpose of the data structure taught in the 665 Patent specification.)

3. Claim 14 of 665 Patent: "comparison table"

**Defendants' Claim Construction Opening Brief**

    a. <u>RLG's proposed construction:</u> Table II of 665 Patent, the basis for the stored values is based upon angular step of 0.1 degree.

    b. Table II is defined in the 665 Patent, and particularly at Column 9.

    c. Specifically, at 9:38 – 40, 665 Patent taught that Table II is a 2-deminsional table with the number of the pulses (or **angular step** number), as the index 91, i, to the rows.

    d. The entry and format for comparison table II are defined in 9:37 – 58.

4. Claim 14 of 665 Patent: "profile table"

    a. <u>RLG's proposed construction:</u> Table I of 665 Patent, the basis for the stored values is based upon angular step of 0.1 degree.

    b. Table I is defined in the 665 Patent, and particularly at Column 9.

    c. Specifically, at 9:26 – 31, 665 Patent taught that the profile table provides for the basis for each profile the aircraft (to be captured, identified and tracked, for the intended operation) where the distance from aircraft to the stopping point can be represented in a vertical angle (at 0.1 degree scan) entry in the table, so that change in present position (to the stopping point) has corresponding change in the stored angle value in the "subsequent scan" (at 0.1 degree scan interval).

5. Claim 14 of 665 Patent: "distance distribution table" (DDT)

    a. <u>RLG's proposed construction:</u> A derivative data collection structure as defined in 665 Patent.

    b. Particularly, at column 10, it provides that "the microprocessor 26 also generates a DDT", containing "the distribution of $a_i$ values as they appear in the Comparison Table II. Thus DDT has an entry representing the number of occurrence of each value of $a_i$ in the

Comparison Table II in 1 meter increments between 10 to 100 meters".

 c. Because DDT is a derivative data structure basing upon Comparison Table II, it follows that the stored value must also be keyed to the angular step of 0.1 degree, for the calculation and readout to make sense.

 d. This DDT table enables the system 10, after every scan, to calculate the average distance, $a_m$, to the correct stopping point 53. See 10:7-8.

6. Claim 1 of 489 Patent: "projecting means"
    a. <u>RLG's proposed construction</u>: The same meaning as the "means for projecting".
    b. 489 Patent did not teach or disclose any "projecting means" other than the corresponding structure taught/disclosed in the 665 Patent.
    c. The "linkage" between the "projecting means" and the disclosed corresponding structure cannot be clearer.
    d. Safegate's 30b6 Rep confirmed that, in 489 Patent, there is no other "projecting means" taught. See deposition pages 67 – 68.

7. Claim 1 of 489 Patent: "comparing means"
    a. <u>RLG's proposed construction</u>: The means of using Profile Table and Comparison Table to check for the matched values echoed back from the projecting means, the data collection and storage is based upon an angular step of 0.1 degree.
    b. The figures 4B, 9, 10 and 11 and the disclosure all support this reading.

    c. The 489 Patent's "corresponding structure" identified herein clearly links to the function recited in the claim and thus this construction meets the *Suffran v. John & John* linkage standards.

    d. If the system 10's actual angular scanning is NOT done in 0.1 degree increment, the "compare" would not work, because it will be like comparing a measurement derived in inches to data store in centi-meters.

8. Claim 1 of 489 Patent: "identifying means"

    a. <u>RLG's proposed construction:</u> Calculating the threshold value of echoes from the two volumes Vi and Vo, using the formula of Vi/(Vi+Vo), to determine whether a feature (such as engine) is in its expected location.

    b. Figures 11 – 14 and the description at columns 14 – 15 support this meaning.

    c. Specifically, 489 Patent defined an "inner volume" and an "outer volume" for the system to detect and identify whether an expected feature (engine) exist at the expected location.

    d. The engine is defined by its coordinates (dx, dy, dz) from the center of the engine front relative to the nose and by its diameter D. See 14: 51 – 54 of 489 Patent and 30b6 Rep depo page 68.

    e. The echoes received back (from the "projecting means") relative to the two defined volumes Vi and Vo are then calculated by the formula of Vi/(Vi+Vo) and if the 0.7 threshold empirical value is exceeded, the feature (engine) is determined to be existing (identified).

9. Claim 11 of 489 Patent: step of "projecting light pulses onto the detected object".
    a. <u>RLG's proposed construction:</u> The step is performed using the "projecting means" disclosed in the Patents-in-Suit.
    b. RLG's proposal serves to give Safegate its "right to exclude" that is commensurate with the scope of its teaching and enablement and preserve the patent validity.

10. Claim 11 of 489 Patent: step of "comparing the detected shape with a profile corresponding to the known shape and for determining whether the detected shape corresponds to the known shape"
    a. <u>RLG's proposed construction</u>: The step is performed using the "comparing means" in Claim 1 of 489 Patent.
    b. RLG's proposal serves to give Safegate its "right to exclude" that's within the scope of its teaching and enablement and preserve the patent validity.

11. Claim 11 of 489 Patent: step of "identifying whether the detected object is the known object by determining whether the detected object has the known feature at the known location".
    a. <u>RLG's proposed construction</u>: The step is performed using the "identifying means" of Claim 1 of 489 Patent.
    b. RLG's proposal serves to give Safegate its "right to exclude" that's within the scope of its teaching and enablement and preserve the patent validity.

**IV. CONCLUSION.**

Defendant RLG's proposed claim constructions truly reflect the proper scope of the Patents-in-Suit's disclosure and enablement.

Defendant RLG's proposed claim constructions rely upon the plain and ordinary meaning of the claims and fits the scope of the disclosure in the specification. "Usually, [the specification] is dispositive; *it is the single best guide to the meaning of a disputed term.*" *Phillips*, at 1321.

It is respectfully urged that the Court should adopt Defendant RLG's proposed claim constructions.

Dated: February 24, 2014

/s/Jen-Feng Lee

Jen-Feng (Jeff) Lee
Kenneth K. Tanji, Jr.
Attorneys for Defendants

## PROOF OF SERVICE

The undersigned certifies that the foregoing document <u>Defendants RLG's Claim Construction Opening Brief,</u> was filed electronically in compliance with Local Rule 5.5 and Federal Rules of Civil Procedure. As such, this document was served on all counsel deemed to have consented to electronic service. Local Rule 5.5 (h). All other counsel of record or per se parties not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. Mail, as identified below:

NONE.

On this 24th day of February, 2014

/s/Jen-Feng Lee
Jen-Feng Lee